**Fred LANCASTER ESTATE,**
**Plaintiff-Appellee,**

v.

**WILLIAMSON COUNTY BANK,**
**Defendant-Appellant.**

Court of Appeals of Tennessee,
Middle Section.

Oct. 21, 1983.

Permission to Appeal Denied by
Supreme Court Jan. 23, 1984.

Thomas E. Fox, Franklin, Jerry C. Colley, Columbia, for plaintiff-appellee.

Mark Hartzog and Donald P. Harris, Hartzog, Harris & Silva, Franklin, for defendant-appellant.

OPINION

CONNER, Judge.

This is an appeal of a probate court's denial of a claim against appellee, the estate of Fred Lancaster, on a promissory note held by appellant, Williamson County Bank.[1] The probate court sustained the estate's exception to the claim based on the contention that the bank allowed credit life insurance issued in connection with the note to terminate without informing the insured.

The facts, for the most part, are undisputed. The promissory note was executed May 9, 1980, by Fred Lancaster, a regular customer of the bank for many years, in the amount of $20,589.21. The note represented a secured obligation that had been periodically renewed since November of 1976. The latest renewal extended the maturity date by thirty days, until June 8, 1980.

In executing the May 9, 1980, renewal note, Mr. Lancaster indicated that he desired credit life insurance. Such insurance was purchased by the bank through the Cherokee National Life Insurance Company for a term of one month, beginning May 13, 1980, the day the note was actually received by the bank, and terminating June 12, 1980. A certificate of insurance, indicating the one-month term, was issued by the bank.

The normal procedure followed by the bank was to mail the customer a notice one week in advance of an upcoming maturity date, advising that the note was about to become due. A second notice was routinely sent on the day following maturity. These notices did not mention credit life insurance renewal. This procedure was apparently followed in this case, but no action was taken by Mr. Lancaster regarding the note prior to the June 8 due date or the June 12 insurance termination.

---

1. Hereinafter the parties will be referred to as in the trial court or by their names, as abbrevi-    ated.

At some point after the maturity date, Michael M. Williams, a bank loan officer, was told that "the note would not be handled for a few days" and he was asked "if we would just park on that, to not send any further notices, that Mr. Lancaster is aware that the note is due and he would get by in a week or so." Mr. Williams could not recall whether this message came directly to him from a Lancaster family member or through another bank official.

Mr. Lancaster was ill during this period of time and was subsequently hospitalized on June 28, 1980. The record indicates that bank officials were aware of his illness and were willing to cooperate with the family, withholding any action on the note pending Mr. Lancaster's recovery.

One of Fred Lancaster's brothers, Clyde, via classic hearsay, but without objection, testified that another brother, Raymond, who worked at the bank, talked with bank chairman Fuller Arnold and bank president George Bivens and was told "that they'd take care of it" until Mr. Lancaster could come in. Sheila Gordon, one of Mr. Lancaster's daughters, testified that Raymond Lancaster said "everything would be put on hold until Daddy could come in and see about it." Mrs. Gordon also testified that Mr. Bivens recalled to her after her father's death that "he did remember Raymond coming by and sticking his head in the door and talking to them ... and he [Mr. Bivens] told him it would be all right to just put it on hold ...." Another daughter, Anita Dial, said she was present when her father telephoned the bank to explain that he had been sick and she heard Mr. Lancaster tell Mr. Williams that "soon as I get able I'll be in the bank and take care of my note."

Mr. Lancaster never recovered from his illness, cirrhosis of the liver, and died on July 19, 1980. Mr. Lancaster's estate was thereafter admitted to probate, and the bank filed a claim based on the note. The original $20,589.21 figure was then reduced by $2,923.45 due to credits from excess life insurance proceeds from other notes held by the bank. An exception to the remaining amount was filed by the estate on the basis that the bank had allowed the insurance on the note to lapse without informing Mr. Lancaster and allowing him the opportunity to keep the insurance in force or obtain another policy. The probate court sustained the exception, denied the claim and thereby discharged the obligation on the note. This appeal timely followed.

The only issue before us is whether the probate court erred in sustaining the exception on the grounds stated, given the evidence just outlined.

At the outset, we have serious reservations as to whether an unconditional promissory note can be discharged simply based on the contention, even if proved, that the lender failed to procure credit life insurance as promised or neglected to notify a borrower of the pending termination of such insurance. This certainly does not appear to be among the grounds stated in the Uniform Commercial Code for discharge on a note. *See* T.C.A. § 47–3–601.

Although we find no cases precisely on point in this state, the Georgia Court of Appeals, dealing with a similar situation, held that a bank's failure to carry out its agreement to procure credit life insurance did not relieve the obligor of liability on a note. *Dekalb County Bank v. Haldi,* 146 Ga.App. 257, 246 S.E.2d 116 (1978). In *Dekalb County Bank,* as in this case, a party obligated on a note was attempting to use the bank's inaction essentially as a defense to liability and as a basis for discharge.[2] (The Georgia court did not reach the issue of "whether the appellant's failure to ob-

2. T.C.A. § 47–3–601 lists the various circumstances in which a party may be discharged from liability on a note and the applicable code sections involved. The *Dekalb County Bank* decision considered the Georgia version of this statute in a fact situation where a guarantor on two notes sought recovery of certain collateral, claiming that the bank's failure to procure the requested insurance discharged the notes. Reviewing two of the most likely grounds for discharge in such circumstances, the court ruled that the bank's action did not constitute a "fraudulent or material alteration" and that to the extent it resulted in an "impairment of collateral," the guarantor had expressly consented to such impairment. The record in the

tain the credit insurance subjected it to liability to the maker's estate." 246 S.E.2d at 117.)

In each of the cases relied upon by the estate in support of the probate court's decision, the insured was not claiming discharge on the subject note but rather had sued the lender or insurer for breach of contract, misrepresentation, fraud or negligence. *See Ezell v. Associates Capital Corp.,* 518 S.W.2d 232 (Tenn.1974); *Nold v. Selmer Bank & Trust Co.,* 558 S.W.2d 442 (Tenn.App.1977). The bank makes a convincing argument that the relief sought by the estate is of a type more appropriately brought before the court by a counterclaim or separate action sounding in contract or tort, not by way of a defense or probate exception claiming discharge of liability on the note.

Even if we assume, *arguendo,* that this case was in the proper posture for determination, we must reverse the finding below based on existing authority and the evidence in the record. Generally, where the term of insurance is revealed in the policy, neither the insurer nor its agent is required to notify the insured of the expiration date absent a statutory duty or an express or implied agreement to provide such notice. *See Mills v. National Life Insurance Co.,* 136 Tenn. 350, 189 S.W. 691 (1916); *Nold,* 558 S.W.2d 442. Although the estate argues the existence of an implied contract on the part of the bank to keep the insurance in effect, the proof is insufficient to support such a conclusion.

The *Nold* decision provides the perfect counterpoint to the instant case. In *Nold,* the court found an implied agreement and imposed liability on the bank after reviewing testimony that (1) money had been paid for what the bank president told family members included interest *and insurance;* (2) prior to being hospitalized, the borrower went to the bank for the express purpose of seeing that his note *and insurance* were in order and was told by bank officials "we will take care of that for you"; (3) the bank president visited the borrower during his illness and assured him that *credit life insurance* covered the debt owed the bank; (4) the borrower died believing that he had credit life insurance in effect; and (5) despite all the express promises and assurances made by the bank in this regard, the credit life policy was allowed to lapse prior to the borrower's death.

In contrast to *Nold,* the evidence here reflects that (1) no action was ever taken by Mr. Lancaster or any of his relatives to renew the insurance or the note itself; (2) no money was ever paid after the due date for interest, insurance or any other purpose; and (3) renewal of the credit life insurance was never discussed or even mentioned by anyone. There is some hearsay testimony to the effect that the bank was willing to withhold action on the note, but there is no indication whatsoever that renewal of the insurance was even considered.

In fact, from this record we are left with the distinct impression that the subject of credit life insurance was simply overlooked by everyone involved. Certainly it was in the best interests of both parties that Mr. Lancaster be insured if he so desired, but apparently neither party recognized the problem. We cannot infer an agreement regarding an issue that was never even discussed by the parties, and in all likelihood never considered by them.

Further, the testimony reflects that the bank had no authority to renew the credit insurance without written consent, and a policy could not legally be written until the note was renewed—which was never done. Thus, to find an implied promise by the bank to keep the insurance in force, we would have to assume the bank would undertake an obligation that it had no authority to fulfill. Under the circumstances of this case, such an assumption is decidedly unwarranted. Even if continuation of the insurance without renewal of the note had been proper, should the bank have advanced

---

instant case does not include the entire loan agreement so we cannot be certain whether it contains the usual language that impairment or release of collateral does not discharge an obligor. Under normal circumstances, however, it

is doubtful that a bank's failure to procure credit life insurance or its neglect in notifying a borrower of the pending termination of such insurance falls within the circumstances justifying discharge under the U.C.C.

its money to pay the premium? Would this have been consistent with the responsibility of the bank to its shareholders and depositors? We think not.

In the final analysis, we are faced with two essentially innocent parties. Nevertheless, it was the oversight of Mr. Lancaster that was the procuring cause of the problem. It was not the bank that failed to renew the note, thereby allowing the insurance to terminate. Rather, it was the inaction of Mr. Lancaster, understandable though it may be, that resulted in his dying without insurance coverage. If anyone could be expected to recognize the gravity of his illness, the seriousness of the situation and the importance of keeping the insurance in effect, it should have been Mr. Lancaster himself or his immediate family, not a distant bank official.

While we are not without sympathy for the estate, we are convinced that based upon existing law the evidence preponderates against the finding of the trial court. Accordingly, the judgment of the probate court is reversed and this cause is remanded. The costs are taxed against the estate.

REVERSED AND REMANDED.

TODD, P.J., and LEWIS, J., concur.